Federal, are usually paid to some agent of the sovereign. Generally, when a written contract is clear and unequivocal its meaning must be determined by its contents alone, and a meaning cannot be given to it other than that which is expressed. In the absence of some ambiguity, which we do not find in the contracts, it is the language which must prevail. These general rules apply in Arizona. Rodriquez v. Childress, 34 Ariz. 489, 272 P. 921; Neale v. Hinchcliffe, 21 Ariz. 452, 189 P. 1116.

All material facts needed for a decision on the issue presented are undisputed, and since the sole issue is one of law, that is, interpretation of a contract provision, we believe that it presents a proper situation for disposition on a motion for judgment on the pleadings. In so deciding we are not unmindful of that degree of caution which the courts exercise in granting this type of motion. Michel v. Meier, D.C., 8 F.R.D. 464, 470. However, the opposing party cannot defeat its use by merely alleging that an issue of fact exists. Felt, for Use of United States v. Ronson Art Metal Works, D.C., 107 F.Supp. 84, 85. While a motion for judgment on the pleadings admits all facts well pleaded, it does not admit, *inter alia*, facts pleaded which would be inadmissible in evidence at trial. Hargis Canneries v. United States, D.C., 60 F.Supp. 729. Having found the provision in question unambiguous, we have no need in this case of the extrinsic evidence which plaintiffs propose to introduce. Neale v. Hinchcliffe, supra.

Therefore, defendant's motion in so far as it is directed at the first, third, fifth and seventh causes of action is granted, and plaintiffs' amended petition on those counts is dismissed. Defendant's motion is denied with respect to the second count (statute of limitation), and the case is referred to a commissioner of the court for further proceedings on that as well as the fourth and sixth causes of action. It is so ordered.

JONES, Chief Judge, and WHITAKER, Judge, concur.

MADDEN, Judge (concurring in the result).

I agree with the court's conclusion. The language of the contract, quoted in the opinion of the court, says quite plainly that the taxes to which it related were federal taxes. The plaintiffs say in argument that they should be permitted to go to trial in order to show that the "intention of the parties" was that the language was also to apply to State taxes. But in their petition they allege only that they so thought and intended. Their misconstruction of plain language, not concurred in nor induced by the other party to the contract, would be immaterial.

My disagreement with the opinion of the court is based upon what I regard as its undue emphasis upon the letter of the contract, and its inference that even though both parties had intended something different from what the language of the contract seemed to say, the language, according to its ordinary reading, would still be controlling.

POWELL et al.
v.
UNITED STATES.
No. 49310.

United States Court of Claims.
March 2, 1954.

Ralph S. Croskey, Philadelphia, Pa., for plaintiffs.

LeRoy Southmayd, Jr., Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER and MADDEN, Judges.

JONES, Chief Judge.

On October 12, 1942, plaintiffs contracted with the Navy Department to manufacture a designated number of carpenter[1] stoppers. This is a suit for what plaintiffs claim is the value of stoppers which they allege had been manufactured but had not yet been delivered at the time the contracts were terminated.

The original contract called for delivery of 761 stoppers. By six change orders the contract was supplemented by adding 667 stoppers and 924 bridles.

The stoppers were to be in three different sizes and the bridles were to be of two sizes. The specifications provided that the stoppers should be "in general accordance with Bureau of Ships Drawing * * * with the bridle omitted."

On June 30, 1943, the same parties entered into a second contract for additional stoppers and bridles to be delivered on or before August 30, 1943.

The first contract provided for stoppers in varying sizes ranging from 1⅝″ to 2″ and for bridles ranging from ⅝″ to 2″. The second contract provided for ⅝″ stoppers and 1⅝″ bridles.

There was no requirement in either contract that the stoppers involved in this suit be proof tested to any particu-

[1] A carpenter stopper is a marine device consisting of an arrangement of metal pieces hinged together which, when clamped over a wire cable and a loose metal wedge block, grips the lay of the cable in such a way that the grip increases as tension is applied to the cable. The interior surfaces of the device which come into contact with the cable are contoured so as to fit the lay of the cable. When in use, one end of the stopper is attached to a bridle (an arrangement of metal links), and the free end of the bridle is in turn fastened to a fixed object on the ship. The free end of the cable is fastened to the object that is to be lifted or towed. The stopper and bridle permit the application or maintenance of a strain on wire cable engaged in ship salvage or towing operations.

lar load, but there was a requirement as to the proof testing of the bridles.

The original contract set up a definite delivery schedule which the plaintiffs were required to meet in the order stated. Under date of November 24, 1942, before any deliveries had been made, plaintiffs were furnished a revised schedule for the first contract divided into Schedule A for deliveries to ships and Schedule B for deliveries to depots. It was provided that Schedule A deliveries were to be given priority over Schedule B deliveries.

On six different dates between March 1 and June 25, 1943, defendant in letters to plaintiffs revised the delivery schedules. While plaintiffs were somewhat in arrears in deliveries on those dates the letters did not complain of that fact, but were directed to the fact that plaintiffs had not followed the prescribed order of delivery pursuant to the designated priority.

As of July 16, 1943, plaintiffs were slightly in arrears on deliveries under the first contract of ⅝″ stoppers, the schedule calling for 796 and 780 having been delivered. No 2″ stoppers had been delivered at that time. No deliveries were made at any time under the second contract, although the contract items were ready for delivery July 16, 1943.

Before articles ready for delivery could be shipped it was required that they be inspected by a Naval inspector. On July 16, 1943, shipments were suspended due to a suspension by the Navy of further inspection of articles offered. The reason assigned was that the Navy had been receiving adverse reports from their field activities to the effect that the equipment was faulty.

On August 27, 1943, plaintiffs were requested by the Naval Inspector in Charge to make arrangements whereby the articles could be tested in accordance with certain prescribed directions.

Plaintiffs made oral protests but none in writing to the July 16 suspension of inspection and to the inspection method prescribed by defendant's letter of August 27, 1943, prior to the termination of the contracts. Between August 27 and October 2, plaintiffs made oral but no written requests for inspection of the articles that had been manufactured.

The stoppers involved in plaintiffs' claim were never inspected prior to the termination of the contract on October 4, 1943, although plaintiffs submitted them to the defendant for purposes of inspection and testing prior to the time of the contract termination.

On October 4, 1943, the Navy notified plaintiffs by telegram of the termination of both contracts, stating that "because of your failure to make deliveries as specified in the subject contracts of material as specified in the subject contracts your right to make deliveries thereunder is hereby terminated."

In October 1943 and July 1944 the Navy conducted tests of certain 1⅝″ stoppers and bridles and ⅝″ stoppers manufactured under the contracts in suit. These tests established that the 1⅝″ stoppers and bridles were defective and failed to meet proof test specifications. The tests to which the ⅝″ stoppers were subjected were beyond any required by the specifications and did not establish that the ⅝″ stoppers failed to meet specification requirements.

The 2″ stoppers were tested by the Navy at the same time. In November and December 1943 the defendant, in response to plaintiffs' protests, advised that no additional deliveries would be permitted. Between the date of cancellation and January 1945 the plaintiffs made several protests and requested reports on the outcome of tests made or being made by the defendant. On January 22, 1945, defendant advised plaintiffs that the test data had not as of that date been received and the record does not disclose when defendant furnished the test data to plaintiffs thereafter.

On September 15, 1949, a price adjustment agreement was entered into on the basis of approximately 77 percent of the original contract price on the material delivered and accepted prior to the termination of the contracts. The agree-

ment stated that "the materials delivered under said contract have been determined by the parties to have been defective and not in accordance with specifications.[2]

Under this agreement plaintiffs released and discharged defendant from all liabilities and claims arising under the contracts except as to material claimed to have been on hand and ready for delivery at the time of the termination, and the claim of interest on the same items.

At all times after July 16, 1943, plaintiffs had on hand and ready for delivery under the first contract seventy-two 2″ stoppers and 324 ⅝″ stoppers; also twenty-four ⅝″ stoppers ready for delivery under the second contract.

In April and October 1951 Navy representatives made visual inspections of the ⅝″ and 2″ stoppers in plaintiffs' possession and waiting delivery acceptance, and reported that they failed to meet requirements as to finish and dimensions.

Our trial commissioner has found, and we have adopted the finding, that the ⅝″ and 2″ stoppers manufactured by plaintiffs under the first contract and ready for delivery at the time of the termination were "in general accordance with" specified drawings of that contract. Likewise we have adopted his finding that the ⅝″ stoppers manufactured by plaintiffs under the second contract and ready for delivery at the date of the termination, were "not in accordance with the specified drawing" of that contract.

There are some rather unusual facts connected with this case. There were no proof-test requirements stipulated in either the first contract or in the specifications connected therewith as to either the ⅝″ stoppers or the 2″ stoppers which are involved in this suit. The record shows that these articles were needed largely because of the great number of ships that were sunk or damaged by the submarines, and that England had developed something along this line. The only evidence as to proof-test requirements in relation to stoppers to be found in the entire record is a British-made stopper which was stamped "Steel wire rope test 5 tons" and which plaintiffs claim was furnished them by defendant's representatives. This sample is marked "Plaintiffs' Exhibit 3." However, on August 8, 1943, more than 10 months after the contract was executed and more than 20 days after the inspection was discontinued, a notation was placed on the Navy's copy of the official contract drawing to the effect that all stoppers and bridles shall be proofed to 14 short tons. This load test was not on either the contract or the drawings that were furnished to plaintiffs and they were not notified of the notation. In fact, the plaintiffs contend that the first that they knew of any proof-test requirements was at the time of the settlement agreement, at which time they claim they were induced by the notation to believe that the articles delivered under the contract had not been in accordance with specifications, and that they did not realize until they later examined their own copy that such notation was not a part of the original requirement.

Another strange development in connection with the cancellation was the sudden action on the part of the defendant, without any previous complaint of the delay, in cancelling the contract when the deliveries in wartime were so slightly behind the schedule. There are other facts of record which make the action taken even more difficult to understand. The defendant had let a second contract for bridles and stoppers to plaintiffs only about 16 days before the suspension of inspections. Over a period of years the defendant neglected or failed to make inspection of the stoppers that were on

2. Plaintiffs contend that their signatures to this agreement were induced by reliance on a drawing asserted by the Navy to be a copy of an official contract drawing bearing on its face a proof-load requirement of 14 short tons, which requirement was in fact inserted on the drawing August 8, 1943, and did not appear on the contract drawing.

hand, but undelivered at the time of the suspension, though repeatedly requested to do so. An inspection was not made until eight years later, and then only a visual inspection was made. After this belated inspection it was reported that the stoppers failed to meet contract requirements as to finish and dimensions. This report was entirely different from the reasons assigned for the terminations in October 1943, and might have been influenced by the notation that was placed on the defendant's copy of the specifications more than ten months after the signing of the contract and some weeks after the suspension of inspection to the effect that a 14-ton test would be required for the stoppers, and to which test plaintiff did not agree.

██ In view of these facts and in view of the further fact that at the time of the cancellation the submarine menace had been greatly reduced, which fact is shown by the record and is one of which the court may take judicial notice, one cannot help wondering if the picture had not so changed that the Navy felt it did not need any more stoppers. If this were true, the Navy could not be blamed for cancelling the contract, which action it had a right to take, but if so it would seem that it would have been wiser to have frankly said as much. At any rate, in all the circumstances, even conceding the right to cancel, the plaintiffs should be paid for any materials that they had completed and which were ready for delivery at the time of the cancellation if they met the required specifications.

██ As to the second contract, we have found that the ⅝″ stoppers involved in that agreement were not "in accordance with the specified drawing" and therefore plaintiffs are not entitled to recover anything on this particular contract.

As to the first contract, there was a proof test as to the bridles. Concededly the bridles did not meet the test and therefore plaintiffs do not claim that they are entitled to recover on this portion of the contract.

It is very evident that the portion of the contract in reference to stoppers and bridles is separable. In fact, the numbers varied and were not necessarily linked together. Apparently from the record the bridles could have been and probably were ordinary chains. Both stoppers and chains were ordered from other concerns and could have been and probably were used interchangeably. In fact, the chains could be used for many purposes.

We have found that the seventy-two 2″ stoppers and 324 ⅝″ stoppers were ready for delivery under the first contract at the time of the notification of termination and that these stoppers were manufactured "in general accordance with" the specified drawings of that contract. Therefore, we find that plaintiffs are entitled to recover for these particular stoppers.

██ The contract price of the seventy-two 2″ stoppers was $12,888; the contract price of the 324 ⅝″ stoppers aggregated $19,537.20. However, in view of the fact that the plaintiffs made an agreed settlement for the stoppers of this size that were actually delivered on the basis of approximately 77 percent of the original contract price, and in view of all the circumstances and the facts disclosed by the record, we find that plaintiffs should recover only 77 percent of the contract price of the undelivered stoppers. Plaintiffs are entitled to recover the sum of $24,967.40.

It is so ordered.

MADDEN, WHITAKER and LITTLETON, JJ., concur.